UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **LA COMMUNITY DEVELOPMENT FUND, LLC** | **CIVIL ACTION NO. _____** |
| **VERSUS** | **JUDGE _____** |
| **LANCASTER POLLARD MORTGAGE COMPANY AND ABC INSURANCE COMPANY** | **MAGISTRATE JUDGE _____** |

**COMPLAINT FOR SPECIFIC PERFORMANCE AND DAMAGES FOR BREACH OF CONTRACT AND VIOLATION OF PLAINTIFF'S CIVIL RIGHTS**

NOW INTO COURT, through undersigned counsel, comes plaintiff, LA Community Development Fund, LLC ("LA Community"), which, upon information and belief, respectfully represents:

**JURISDICTION AND VENUE**

1.

This is an action within this Honorable Court's jurisdiction pursuant to 42 U.S.C. Section 1982 and Title VIII of the Civil Rights Act of 1968 ("Fair Housing Act"). Supplemental jurisdiction is invoked as to matters cognizable under the Constitution and laws of the State of Louisiana, particularly, but not exclusively, La. C.C. arts. 1927, 1983, 1986, 1989, 1991, 1994, 1995, 1997 and 1999.

2.

Venue is proper in the Middle District of Louisiana. The events or omissions giving rise to this action occurred within this judicial district (28 U.S.C. § 1391).

1

## PARTIES

3.

Plaintiff, LA Community, is a Louisiana African-American owned and controlled limited liability company domiciled in the Parish of East Baton Rouge, State of Louisiana.

4.

Made defendant herein is Lancaster Pollard Mortgage Company ("Lancaster") which, upon information and belief, is an Ohio corporation which engages in finance business in the State of Louisiana. Lancaster was at all times represented by its senior vice president, Carl Wagner ("Wagner").

5.

Defendant, ABC Insurance Company, is believed to be the insurance company that insures Lancaster against errors and omissions regarding liability similar to that which is the subject of this litigation.

## STATEMENT OF FACTS

### (The Project)

6.

Louisiana Community Development Capital Fund, Inc. ("CAP Fund") owns the property located at 1132 RWE Jones Drive, Grambling, Louisiana, (the "Property").

7.

The Property consists of a seventy (70) room studio apartment complex and 7,500 square foot conference center located on approximately 5.5 acres at the intersection of RWE Jones Drive and Interstate 20 in rural north Louisiana.

8.

On June 29, 2009, LA Community, and CAP Fund entered into an agreement in Baton Rouge, Louisiana wherein LA Community agreed to lease the Property for Five Thousand Seven Hundred and 00/100 ($5,700.00) Dollars per month in rent with an option to buy the Property for One Million Five Hundred Thousand and 00/100 ($1,500,000.00) cash and a second mortgage. *See* Exhibit 1, attached.

9.

There is a first mortgage on the Property in the amount of Six Hundred Thousand and 00/100 ($600,000.00) Dollars in favor of the United States Department of Agriculture Rural Development (USDA RD).

10.

LA Community proposed to lease and purchase the Property and renovate the existing housing facility into an affordable housing complex called Serenity Place Housing ("Serenity") which would consist of thirty-one (31) three-bedroom, two-bedroom, and one-bedroom apartments (the "Project").

11.

The total project cost, including the sale of the Property and development financing was projected to be approximately Three Million and 00/100 ($3,000,000.00) Dollars.

12.

In order to finance the Project, LA Community submitted an application to the Louisiana Housing Finance Agency (LHFA) and was awarded a HOME grant in the amount of Two Hundred Forty Six Thousand and 00/100 ($246,000.00) Dollars.

13.

Additionally, LA Community secured an independent contractor, Superior Community Capital Corp of Clarksdale, Mississippi, ("Superior") to identify the remainder of the required construction and permanent financing in the amount of approximately Two Million Seven Hundred Fifty Four Thousand and 00/100 ($2,754,000.00) Dollars.  Plaintiff paid Superior Five Thousand and 00/100 ($5,000.00) Dollars as consideration for its services, with another Ten Thousand and 00/100 ($10,000.00) to be paid at closing.

14.

On information and belief, Superior submitted a project narrative and financial information for the Project to its corresponding lender, Lancaster, to submit an application for a loan guarantee from the United States Department of Agriculture Rural Development Agency under the Section 538 loan guarantee program.

15.

By letter dated March 15, 2010, Superior informed LA Community, through its manager Dr. Ernest Johnson, that the request for funding had been underwritten and approved by Superior and its corresponding lender, Lancaster.  *See* Exhibit 2, attached.

16.

After performing underwriting of the construction loan and permanent request from LA Community, Lancaster agreed and submitted a response to the Section 538 Guaranteed Rural Rental Housing Program Fiscal Year 2010 NOFA to the United States Department of Agriculture Rural Development Agency (USDA RD) in Alexandria, Louisiana seeking approval to submit an application for conditional commitment on behalf of LA Community.

17.

On April 7, 2010, the USDA RD sent Lancaster a selection letter informing it that the NOFA response submitted on behalf of LA Community had been selected for further processing. *See* Exhibit 3, attached.

18.

The USDA RD selection letter indicated that a conditional commitment of guarantee would be issued after the application for loan guarantee had been successfully processed. *See* Exhibit 3.

19.

Moreover, the USDA RD selection letter informed Lancaster that is was imperative that it complete an application for the selection as soon as possible because obligation of guarantee funds are awarded on a "first come-first served basis." *See* Exhibit 3.

20.

Finally, the USDA RD selection stated that once FY 2010 funds are exhausted, if eligible, requests not obligated will be retained for consideration for FY 2011 without having to submit a new response. *See* Exhibit 3.

**(The Conditional Commitment)**

21.

Lancaster, through its agent Wagner, signed a Conditional Commitment on April 30, 2010 which stated that Lancaster had conducted preliminary "due diligence" on the Project, including mortgage sizing analysis using USDA loan underwriting criteria. *See* Exhibit 4, attached.

22.

Lancaster, as lender, agreed in the Conditional Commitment to provide a Rural Development Section 538 (RD 538) Guaranteed Loan to LA Community, as borrower, if all the conditions were fulfilled. *See* Exhibit 4.

23.

The Conditional Commitment outlined the following terms for the loan:

A. The loan funds will be used to finance the permanent financing for the Property.

B. Market interest rates at the time of closing. (Estimated 6.0%). The interest rate is set at loan closing.

C. Estimated of all fees for securing the loan with RD 538 Guarantee is the greater of: two hundred (200) basis points of the Loan Amount, or thirty five thousand dollars ($35,000) paid at the closing of the loan. Additionally, Borrower will pay Lender's Legal Costs, estimated at fifteen thousand dollars ($15,000).

D. 1st and best lien position on the Land and Improvements of the Property.

E. No other liens or loans on the property without prior written approval of Lancaster.

**F. Prerequisites for the Loan:**

    1. A Conditional Commitment for a Loan Guarantee by the U.S. Department of Agriculture Rural Housing Service pursuant to Section 538 in an amount not less than the Loan;

    2. Market interest rates at the time of loan pricing consistent with final loan underwriting;

    3. A Firm Commitment from other funding providers acceptable to Lancaster;

    4. Draft of Limited Partnership Agreement acceptable to Lancaster;

5. Any additional funding commitments (construction, HOME loans);

6. Any Additional information, due diligence and/or documentation required by Lancaster or USDA.

G. Borrower shall pay all costs and expenses in connection with the making of this Loan, including, but not limited to, surveys, title insurance, recording and filing fees, environmental fees, legal fees, and appraisal fees.

*See* Exhibit 4 (emphasis added).

24.

LA Community, through Johnson, accepted the offer contained in Lancaster's April 30, 2010 Conditional Commitment at its office located in Baton Rouge, Louisiana. *See* Exhibit 4.

**(The Engagement Agreement)**

25.

On or about May 5, 2010, Lancaster sent LA Community a proposed Engagement Agreement wherein, Lancaster offered to act as the USDA approved lender in processing the application for a Guarantee on the Project using Section 538. *See* Exhibit 5, attached.

26.

Pursuant to the terms of the proposed Engagement Agreement, Lancaster would have the exclusive right to represent LA Community in the application to USDA for a Loan Note Guarantee and the exclusive right to fund the guaranteed loan through the sale of (i) tax-exempt bonds to be issued by an affiliate of Lancaster, (ii) taxable bonds to be issued by an affiliate of Lancaster, or (iii) other securitized obligation or whole loan sale. *See* Exhibit 5.

27.

The proposed Engagement Agreement provided that as consideration for Lancaster's USDA processing services and making the Loan, LA Community would be charged the greater

of: (i) two percent (2.00%) of the amount of the Loan for USDA mortgage processing (the "Financing Fee") for providing the initial funding and arranging subsequent Loan funding with the USDA Guarantee, or (ii) thirty five thousand dollars ($35,000). *See* Exhibit 5.

28.

The Financing Fee was to be paid as follows:

A. A Good Faith Deposit of Ten Thousand ($10,000) was payable upon acceptance of the agreement. The parties agreed that if Lancaster determined through due diligence that the project is infeasible or ineligible for a Loan with a USDA Guarantee, Lancaster would promptly refund the Good Faith Deposit net of expenses and the agreement would be cancelled and the obligations of Lancaster and LA Community would terminate.

B. The entire Financing Fee would be payable at the time of the construction loan closing.

C. In the event that Lancaster received a conditional commitment for a Guarantee from USDA and LA Community voluntarily decided to terminate the transaction, one half (50%) of the Financing Fee would become payable.

*See* Exhibit 5.

29.

Johnson forwarded to Lancaster a good faith deposit in the amount of Ten Thousand and 00/100 ($10,000.00) Dollars on June 1, 2010. *See* Exhibit 6, attached.

30.

On June 8, 2010, LA Community, through Johnson, accepted Lancaster's proposed Engagement Agreement by executing the Engagement Agreement at LA Community's office located in Baton Rouge, Louisiana and forwarding the same to Wagner via Federal Express on that same date.  *See* Exhibits 5 and 7, attached.

**(Lancaster Terminates the Agreement)**

31.

Despite LA Community's numerous requests for status reports, Lancaster delayed the loan process by not providing updates until September 30, 2010 when Wagner indicated in the Lancaster Underwriting Information sheet that the following issues/questions needed to be addressed before the loan would be funded:

1. Where is the $800,000 soft second mortgage coming from?
2. Can you live with 100% of the developer's fee deferred?
3. There still is a GAP of $133,551 to fill.
4. Is the purchase price for the property "As is" $1,500,000?
5. We need to resolve these issues **before we can present this deal to our credit committee**. (emphasis added)

*See* Exhibit 8, attached.

32.

Based on Wagner's statements in the Lancaster Underwriting Information sheet, LA Community's loan request has never been presented to Lancaster's credit committee for approval.  *See* Exhibit 8.

33.

Wagner furthermore represented in his September 30, 2010 email correspondence that "[t]he funding for 2010 ends COB 9/30/10 but there should be funding in FY 2011" and that Lancaster would continue the underwriting process.

9

34.

LA Community objected to the reasons Wagner offered for Lancaster's delay in the loan process on the basis that said reasons were invalid, but nonetheless agreed to secure the construction financing in order to reduce the financial gap alleged by Wagner.

35.

LA Community secured a firm commitment from 84 Financial Services to provide construction financing to satisfy Wagner's Gap Financing concerns. *See* Exhibit 9, *in globo*, attached.

36.

Wagner sent another email on October 29, 2010 alleging that the deal still did not work and citing the following concerns:

1. We need more sources of funds to make it work.
2. The 84 Lumber Construction issue is helpful but it only solves the construction lender problem.
3. I still do not understand why you are pay [sic] $1,500,000 for the property our [sic] why there is an $800,000 soft second debt being imposed.
4. RD is going to have to review the appraisal and in my opinion they are not going to be comfortable with the sales price.
5. As I understand it you have a $675,000 plus or minus NON Program Loan with RD. My understanding of nonprogram loan is that it is not eligible to any of the servicing options available to other loans. For example the subordination to another loan.
6. RD did not tell you when you were in the office that the 538 program has only 2.9 million dollars under the continuing resolution at this time but they have a back log of applications of approximately 37 million dollars of projects to be funding [sic]. Even if they had the application it is unlikely they would be able to provide the conditional commitment to LP for many months.

*See* Exhibit 10, attached.

PD.4557836.2

37.

Wagner's October 29, 2010 statement regarding a shortage of funding (see paragraph 36, number 6, above), is contrary to his September 30, 2010 email correspondence wherein he stated that there should be funding in 2011.

38.

Wagner further suggests in his October 29, 2010 email that the following actions need to happen in order to continue with the process:

1. We need to get a solid and agreed up funding strategy for this project that makes sense. This in my opinion includes getting and [sic] infusion of funding from LIHTC, Home Funds or other free funding sources.
2. We need to revisit the possible time line for funding and make it realistic.
3. Once I am comfortable with the proposal I will gladly take it to LP Credit Committee and support it.
4. In my opinion RD will not provide the CC to this proposal as it stands and frankly LP will not present it to RD as it is currently proposed.

*See* Exhibit 10.

39.

Although LA Community secured construction financing for the Project, Wagner, without submitting the transaction to the Lancaster Credit Committee, continued to evaluate the loan as of October 29, 2010 using the same numbers contained in his September 30, 2010 underwriting analysis which included construction financing as well as inflated prices.

40.

These errors and omissions resulted in the continued apparent existence of an alleged gap in financing which Wagner used as a barrier to financing.

41.

As is demonstrated by the USDA RD letter received by Johnson on December 13, 2010 and as LA Community will show at trial, Wagner misrepresented the facts when he stated that USDA would not subordinate its non-program to 84 Financial construction loan. *See* Exhibit 11, attached.

42.

LA Community will show at trial that Wagner misrepresented the facts when he stated that USDA RD would not provide the 538 Conditional Commitment based upon the underwriting numbers.

43.

As a result of Wagner's misrepresentations, his errors and omissions in evaluating the sources and uses, his refusal to submit the request for permanent loan to Lancaster's credit committee and/or the USDA RD for approval and other negligent acts, LA Community sent a demand letter dated November 1, 2010 accepting Lancaster's offer to continue working to provide the permanent loan and demanding specific performance. *See* Exhibit 12, attached.

44.

Upon information and belief, after speaking with the USDA RD representative on November 3, 2010, Wagner sent a letter dated November 4, 2010 informing LA Community that Lancaster was no longer interested in the transaction. The letter failed to cite any reasons for the termination which constituted a breach of Wagner's October 29, 2010 offer to continue processing the loan and a breach of the Engagement Agreement. *See* Exhibit 13, attached.

**(Bad Faith Actor)**

45.

On information and belief, plaintiff contends that Lancaster acted in bad faith because its senior vice president, Wagner, had in his possession information as early as March 16, 2010 (prior to submitting the USDA RD 538 NOFA Response in April 2010) that certain unnamed USDA representatives had informed him that LA Community would not be successful in obtaining any funding from the USDA RD.  *See* Exhibit 14, attached.

46.

Despite knowing this information, Lancaster agreed to submit the 538 NOFA Response to USDA RD on March 17, 2010, issued a Conditional Commitment dated April 30, 2010, executed an Engagement Agreement dated May 5, 2010, accepted a $10,000 deposit, and delayed the loan process until September 30, 2010, which was the end of the 2010 fiscal year.

47.

Moreover, Lancaster's April 30, 2010 Conditional Commitment, signed by Wagner, was also used to induce the Louisiana Housing Finance Agency (LHFA) to begin funding the HOME grant, of which $10,000 was paid to Lancaster.

48.

LA Community will prove at the trial on the merits that its loan application submitted to Lancaster complied with all of the requirements contained in the Engagement Agreement and the Conditional Commitment, there was no gap in financing, and, therefore, LA Community's loan application should have been submitted to Lancaster's credit committee and USDA RD for approval.

## COUNT ONE: BREACH OF CONTRACT

49.

LA Community repeats and re-alleges each and every allegation contained in Paragraphs 1 through 46, above, and incorporate them herein by reference.

50.

Lancaster breached the terms of the April 30, 2010 Conditional Commitment Agreement which was accepted by LA Community in Baton Rouge, Louisiana.

51.

Lancaster breached the terms of the May 5, 2010 Engagement Agreement which was accepted by LA Community on June 8, 2010 in Baton Rouge, Louisiana.

52.

Lancaster has failed to return any of the $10,000 Good Faith Deposit and has not submitted an itemized statement showing expenses in violation of the Engagement Agreement.

53.

Furthermore, according to the terms of the Engagement Agreement, Lancaster was to provide LA Community with copies of submissions made to the USDA office on LA Community's behalf; however, Lancaster violated this term of the agreement.

54.

LA Community will show at the trial on this matter that Lancaster's due diligence and analysis were based on errors and omissions which are covered by ABC Insurance Company.

## COUNTS TWO AND THREE:
## VIOLATIONS OF FAIR HOUSING ACT AND 42 USC § 1982

55.

Lancaster violated Title VIII of the Civil Rights Act of 1968 ("Fair Housing Act") and 42 USC, Section 1982 in making the negative statements contained in Wagner's email communication of October 29, 2010.

56.

Lancaster violated the Fair Housing Act and 42 USC, Section 1982 by failing to help petitioner make its best case in applying for the loan.

57.

Lancaster violated the Fair Housing Act and 42 USC, Section 1982 by requesting unnecessary additional information which resulted in long delays.

58.

Lancaster violated the Fair Housing Act and 42 USC, Section 1982 by creating barriers to delay loan closing, *i.e.*, alleging gap in financing, that USDA RD would not subordinate construction loan, that RD would not approve the loan, that USDA RD would not approve the value of the Property, etc.

59.

Lancaster violated the Fair Housing Act and 42 USC, Section 1982 by denying LA Community, an African-American owned company, the right to continue applying for a loan.

## CONCLUSION

60.

LA Community is entitled to specific performance pursuant to 42 USC, Section 1982 in accordance with the terms of the Engagement Agreement.

61.

LA Community is entitled to all compensatory damages to be proven at trial on the merits including, but not limited to, the sale of the property, cost of the Serenity Designed Build Contract, cost of experts, loss of rental income, Ten Thousand ($10,000) Dollar deposit, and other related expenses.

62.

Lancaster should also be ordered to return the Ten Thousand ($10,000) Dollar deposit.

63.

Because of Lancaster's bad faith and attempt to discourage LA Community from applying for the loan in violation of the Fair Housing Act and 42 USC, Section 1982, LA Community should be awarded punitive damages in an amount to be set by the Court.

64.

Because of Lancaster's bad faith and attempt to discourage LA Community from applying for the loan in violation of the Fair Housing Act and 42 USC, Section 1982, LA Community should be awarded attorneys' fees.

**PRAYER FOR RELIEF**

65.

WHEREFORE, Plaintiff, LA Community Development Fund, LLC, prays that the Court:

A. Enter a declaratory judgment that the aforementioned facts and the practices of the defendants, Lancaster Pollard Mortgage Company and ABC Insurance Company, are in violation of the laws of the United States of America and the State of Louisiana;

B. Enter judgment in favor of Plaintiff and against Defendants awarding Plaintiff special, general and punitive damages in an amount deemed fair and equitable;

C. Order specific performance by the defendant, Lancaster Pollard Mortgage Company, to approve Plaintiff's loan application; and

D. Award Plaintiff the cost of the this litigation, including reasonable attorneys' fees.

January 19, 2011.

        Respectfully submitted,

        **PHELPS DUNBAR LLP**


        BY:   /s/ Shelton Dennis Blunt
              Shelton Dennis Blunt, Bar Roll No. 21230
              Laranda Moffett Walker, Bar Roll No. 31266
              II City Plaza | 400 Convention Street, Suite 1100
              Baton Rouge, Louisiana 70802-5618
              Post Office Box 4412
              Baton Rouge, Louisiana 70821-4412
              Telephone: 225-346-0285
              Telecopier: 225-381-9197
              Email: bluntd@phelps.com
                    laranda.walker@phelps.com

        ATTORNEYS FOR PLAINTIFF
        LA COMMUNITY DEVELOPMENT FUND, LLC